[Docket No. 6]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

CITY OF MARGATE,

    Plaintiff,

       v.

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION, WEEKS
MARINE INC., and UNITED STATES
ARMY CORPS OF ENGINEERS,

    Defendants.

Civil No. 17-5766 (RMB/JS)

**OPINION**

APPEARANCES:

Jordan M. Rand, Esq.
Matthew J. McDonald, Esq.
Klehr Harrison Harvey Branzburg
1835 Market Street, Suite 1400
Philadelphia, PA 19103

John Scott Abbott, Esq.
Law Offices of John Scott Abbott
9 South Washington, Suite One
Margate, NJ 08402
    *Attorneys for Plaintiff City of Margate*

Kristina Lee Miles, Esq.
New Jersey Department of Law & Public Safety
Division of Law
25 Market Street
P.O. Box 093
Trenton, NJ 08625
    *Attorney for Defendant New Jersey Department of*
    *Environmental Protection*

Thomas R. Valen, Esq.
Damian V. Santomauro, Esq.
Gibbons, PC
One Gateway Center

Newark, NJ 07102
    *Attorney for Defendant Weeks Marine Inc.*

Anne B. Taylor, Esq.
Office of the U.S. Attorney
District of New Jersey
401 Market Street, 4th Floor
P.O. Box 2098
Camden, NJ 08101
    *Attorney for Defendant United States Army Corps of
    Engineers*


**BUMB**, UNITED STATES DISTRICT JUDGE:

   This matter comes before the Court upon the Motion for
Emergent Dissolution of Temporary Restraints (the "Temporary
Restraining Order") [Docket No. 6] by Defendant Army Corps of
Engineers (the "Army Corps") seeking the immediate dissolution
of the temporary restraints issued by the Honorable Julio L.
Mendez of the Superior Court of New Jersey, Atlantic County,
Chancery Division, on August 3, 2017 [Docket No. 1-4] prior to
removal of the action to federal court.  For the reasons set
forth below, the Court grants, in part, the Army Corps' motion
and modifies the Temporary Restraining as set forth herein and
in the accompanying Order.

   On August 3, 2017, Plaintiff City of Margate ("Margate")
filed a Verified Complaint in the New Jersey Superior Court,
alleging a single count of public nuisance against Defendant New
Jersey Department of Environmental Protection ("NJDEP") and
Weeks Marine Inc. ("Weeks") [Docket No. 1-1], as well as an

Order to Show Cause seeking temporary restraints, declaratory judgment, and entry of a permanent injunction ceasing the construction of the Absecon Island Coastal Storm Risk Reduction Project (the "Project") [Docket No. 1-2], an entirely federally-funded project of the Army Corps. The Army Corps has contracted with Weeks to construct the dune and berm system necessitated by the Project. The Project is currently under construction in Margate and has not yet been completed. Margate seeks to enjoin the construction of the Project due to ponding after rain events that has resulted between the bulkhead on the beach and the landward toe of the dunes constructed thus far. Construction of the Project is already well underway and dunes have been installed in much of Ventnor, to the north of Margate.

Judge Mendez held a telephonic hearing on August 3, 2017 regarding Margate's application and granted temporary restraints that day. Because the Army Corps was not a party to the state court action, it did not participate in the hearing. In his Order, Judge Mendez temporarily enjoined the NJDEP and Weeks "from further construction" of the Project until August 11, 2017 and required NJDEP and Weeks to "take all necessary steps to remedy pools of standing water and beach flooding in those areas where Project construction has commenced." TRO ¶¶ 10-11 [Docket

No. 1-4].[1]  Additionally, Judge Mendez ordered the Army Corps as
an indispensable party in the matter and directed
representatives of Margate, the NJDEP, the Army Corps, and Weeks
to meet every day until August 11, 2017 "to engage in meaningful
discussions and negotiations to resolve issues related to beach
flooding, ponding, and storm water drainage connected with the
Dunes project on Margate beach."  Id. ¶¶ 12-14.[2]

        The following day, the Army Corps, as an agency of the
United States, properly removed the action to federal court
pursuant to 28 U.S.C. § 1446(b)(1).  Notice of Removal [Docket
No. 1].  Thereafter, the Army Corps filed the instant motion,
seeking the immediate dissolution of the temporary restraints,
arguing that the state court did not have jurisdiction to enjoin
the Army Corps and because the issuance of the injunction was
not justified by the facts.  Weeks does not oppose the Army
Corps' motion.  On August 9, 2017, the Court held a hearing on

---

[1] As the Army Corps was not yet a party to the state action,
as noted above, Judge Mendez did not have the benefit of the
Army Corps' participation in the hearing or the opportunity to
consider the live testimony of witnesses, as this Court did.

[2] Pursuant to New Jersey Court Rule 4:28-1, as under Federal
Rule of Civil Procedure 19, a court may order an indispensable
party to be added to the litigation.  The parties do not dispute
that the Army Corps is properly a party to this litigation.

the motion, at which Margate and the Army Corps presented legal

argument and evidence.[3]

This Court is permitted to review the temporary restraints

issued by the state court as if this Court had issued them

itself. All orders and injunctions issued by a state court

prior to removal "shall remain in full force and effect until

_____

[3] While the NJDEP was also present at the hearing, it has
asserted its sovereign immunity under the Eleventh Amendment and
has not consented to this Court's jurisdiction. Both the Army
Corps and the NJDEP, as agencies of the United States and New
Jersey state governments, respectively, enjoy sovereign immunity
under certain circumstances. "Absent a waiver, sovereign
immunity shields the Federal government and its agencies from
suit." Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 475
(1994). Sovereign immunity is a jurisdictional question and
"the terms of the [United States'] consent to be sued in any
court define the court's jurisdiction to entertain the suit."
Id. As a result, to the extent that the Army Corps has
consented to be sued for public nuisance, the federal courts
have exclusive jurisdiction over such claims. 28 U.S.C.
§ 1346(b)(1); see also 5 U.S.C. § 702. Thus, the Army Corps
cannot consent to jurisdiction before the state court. See,
e.g., 28 U.S.C. § 1346(b)(1); 5 U.S.C. § 702; Parisi v. United
States, 2013 WL 1007240, at *2-3 (D.N.J. Mar. 12, 2013). The
same cannot be said of the NJDEP. The NJDEP's sovereign
immunity "is a personal privilege which it may waive at
pleasure" and the decision to do so "is altogether voluntary on
the part of the sovereignty." Coll. Sav. Bank v. Florida
Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675
(1999). The NJDEP has repeatedly insisted that it is not
waiving its sovereign immunity. As a result, the parties have
represented to the Court that Margate has filed yet another
action against the NJDEP in state court. The NJDEP's stance is
inimical to the purportedly common goals of resolving this
dispute efficiently and effectively and constructing the dunes
promptly and properly. It is unfortunate that Margate should be
forced to litigate this dispute--which unquestionably requires
cooperation and input from all parties to be resolved--in a
piecemeal fashion before two courts.

dissolved or modified by the district court."  28 U.S.C. § 1450.

Thus, "[a]fter removal, interlocutory orders of the state court

are transformed into orders of the court to which the case is

removed."  In re Diet Drugs, 282 F.3d 220, 231-32 (3d Cir.

2002); accord Granny Goose Foods, Inc. v. Brotherhood of

Teamsters, 415 U.S. 423, 437 (1974); Cooper Health Sys. v.

Virtua Health, Inc., 259 F.R.D. 208, 212 (D.N.J. 2009).  The

power to dissolve or modify temporary restraints or a

preliminary injunction is left to the discretion of the district

court.  Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.,

335 F.3d 235, 241 (3d Cir. 2003) (citing Glasco v. Hills,

558 F.2d 179, 180 (3d Cir. 1977)).  When considering whether to

dissolve such restraints, a court must consider whether the

movant has made a showing of changed circumstances that warrant

discontinuation of the order.  Id. at 242 (citing Twp. Of

Franklin Sewerage Auth. v. Middlesex County Utils. Auth., 787

F.2d 117, 121 (3d Cir. 1986)).

Additionally, the Army Corps moves for reconsideration of

the Temporary Restraining Order under District of New Jersey

Local Civil Rule 7.1(i).  Local Civil Rule 7.1(i) permits a

court to reconsider its order where one of three circumstances

is present: (1) an intervening change in the controlling law;

(2) the availability of new evidence not previously available;

or (3) the need to correct a clear error of law or prevent

manifest injustice.  <u>Telebrands Corp. v. Harvest Direct, LLC</u>,
2017 WL 1365216, at *3 (D.N.J. Apr. 6, 2017) (citing <u>Carmichael
v. Everson</u>, 2004 WL 1587894, at *1 (D.N.J. May 21, 2004)).

    Here, as noted, the Army Corps did not participate in the
hearing on the application for temporary restraints before the
state court and did not have the opportunity to present evidence
or argument in opposition.  Additionally, the state court did
not have jurisdiction to enjoin the Army Corps, an agency of the
United States government, from constructing a federal project or
to mandate the Army Corps' participation in the meetings with
Margate, the NJDEP, and Weeks.  <u>See</u> <u>supra</u> n.2.  Given the
addition of the Army Corps, a federal agency over which the
state court lacked jurisdiction, to the litigation and the
evidence presented to this Court, the Court finds, for the
reasons set forth herein, that changed circumstances warrant
modification and dissolution, in part, of the temporary
restraints.  Moreover, for the reasons set forth herein, the
Court reconsiders the Temporary Restraining Order and finds that
modification and dissolution, in part, of the temporary
restraints is necessary to correct a clear error of law or fact
and to prevent manifest injustice.

    "Preliminary injunctive relief is 'an extraordinary remedy'
and 'should be granted only in limited circumstances.'"  <u>Kos
Pharm., Inc. v. Andrx Corp.</u>, 369 F.3d 700, 708 (3d Cir. 2004)

(quoting American Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994)). The decision to issue a temporary restraining order is governed by the same standard as a preliminary injunction. Singer Mgmt. Consultants, Inc. v. Milgram, 650 F.3d 223, 236 n.4 (3d Cir. 2011) (citing Miller v. Mitchell, 598 F.3d 139, 145 (3d Cir. 2010)). A plaintiff seeking a temporary restraining order or a preliminary injunction must demonstrate: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. Kos, 369 F.3d at 708. The party seeking preliminary injunctive relief must meet all four factors and "failure to establish any element in [the plaintiff's] favor renders a preliminary injunction inappropriate." NutraSweet Co. v. Vit-mar Enters., Inc., 176 F.3d 151, 153 (3d Cir. 1999); accord Lanin v. Borough of Tenafly, 515 F. App'x 114, 117 (3d Cir. 2013) ("All four factors must favor preliminary relief.").

Turning to the first factor, likelihood of success on the merits, the only cause of action currently asserted by Margate is a public nuisance claim, which appears to be brought under New Jersey state law. The Army Corps contends that Margate cannot establish a likelihood of success on the merits of its

state law public nuisance claim as the United States has not
waived its sovereign immunity for state tort claims seeking
injunctive relief.  Army Corps Br. at 11 n.2 [Docket No. 6-1]
(citing 28 U.S.C. § 1346(b)(1)).  While the Army Corps may be
correct that it is immune from suit for state tort claims for
injunctive relief, the Verified Complaint does not presently
address the Army Corps specifically and may be amended to assert
a federal public nuisance claim against the Army Corps.[4]  Given
the state of the pleadings, the Court does not expressly resolve
whether Margate can establish a likelihood of success on the
merits of its currently-pled public nuisance claim and relies
instead upon the remaining factors in resolving the instant
motion.

The Court next considers the facts and arguments relevant
to irreparable harm, the balancing of the equities and harms,
and the public interest.  Margate argues that the temporary
restraints should continue because of the grievous public health
and safety hazards caused by the extensive ponding and standing
water.  Margate contends that the standing water poses risks
like drowning of children who may be attracted to the still,
warm water, as well as health hazards to those who come into

---

[4] The Court notes that this approach was utilized by private
plaintiffs, residents of Margate, against the Army Corps in a
related litigation.  See Am. Compl. [Docket No. 29], Civil
Action No. 16-8198 (RMB/JS).

contact with the water while traversing the basin to reach the beach. Margate also claims that the construction of the dunes will damage its reputation and the business opportunities of its residents.

The Army Corps counters that the timely construction of the Project is essential for the protection of not only the citizens of Margate, but the citizens of all of Absecon Island from the destructive effects of storm surge, hurricane damage, and beach erosion. Without protection from hurricanes, property may be damaged and lives endangered. That recent hurricanes, such as Hurricane Sandy, have resulted in widespread destruction throughout the region is unquestionable. Indeed, the Court heard testimony about the devastating impact of Hurricane Sandy on Margate. The entire purpose of the Project is to prevent such devastation from recurring. If the construction of the dune and berm system is delayed, Margate may remain unprotected from the ravages of storms during hurricane season. Moreover, as the Army Corps' project manager, Keith Watson, testified, Weeks is working on a tight schedule to complete the Project, as well as several other projects, including other beach replenishment and storm protection projects for the Army Corps. Delay of this Project will result in a domino effect, leaving other shore communities exposed to hurricane damage. The evidence before the Court, including the testimony of Mr. Watson

and the Hydrological Investigation Report issued by the Army

Corps [Pl. Ex. 2], establishes that the Project, when

constructed in its entirety, will protect the citizens of

Absecon Island.

There is no evidence in the record that controverts the

Army Corps' position that the Project will ultimately serve its

purpose of protecting the public.[5]  Indeed, Assemblyman Chris

Brown recognized that the dune system that had already been

installed in Ventnor during Hurricane Sandy effectively

protected the town from the bulk of the hurricane damage.  He

testified that not only did the dunes protect Ventnor during

Hurricane, but stated "I'll agree wholeheartedly, as courts have

pointed out, the dunes certainly will serve a purpose and are an

_____

[5] Margate continues to criticize the Army Corps and the
NJDEP's decision to proceed with construction of the Project,
claiming that its worst fears regarding the Project have come to
fruition.  See Compl. at 2 ("'Fool me once, shame on me.  Fool
me twice, shame on you.  Fool me three times, shame on both of
us.'").  Yet, the Court is unaware of any concerns previously
expressed about during construction conditions.  Indeed, the
Army Corps has admitted that it did not consider these
conditions, see infra.  Rather, Margate and its citizens have
consistently expressed fears and concerns over the long-term
effects of the Project and permanent ponding conditions.  The
Army Corps, however, stands firmly behind its position that once
the dunes are completed, the dune will serve to protect the
beach and any ponding will be no worse than what Margate has now
and will be percolated within 24 to 36 hours.  The Court
reiterates that there is a critical and meaningful difference
between shorter-term ponding conditions that arise during
construction and can be mitigated, as opposed to permanent
conditions that arise after the Project has been completely
constructed.

available part of mitigating storm damages.  I couldn't agree

with you more."  Additionally, while it is undisputable and,

indeed, undisputed among the parties, that public safety and

health are of paramount concern, the Army Corps will incur costs

of more than $120,000 per day while the temporary restraints are

in place and, as set forth above, risk having the contract with

Weeks terminated and jeopardizing other government projects that

Weeks is contracted to construct.

While many of Margate's witnesses seemed to recognize the

possible future harms that the dunes are designed to prevent,

Margate understandably stresses the ongoing public health and

safety concerns raised during construction of the dunes.  Much

of the hearing before this Court was spent stating the obvious:

the current conditions of Margate's beach are not acceptable to

anyone.  In some of the areas where dunes have been constructed,

expansive ponds cover much of the beach between the bulkhead and

the landward toe of the dunes, creating hazardous conditions for

those attempting to reach and enjoy the beach.  Such hazards are

all the more dangerous for young children who may be attracted

to the still, shallow, warm water.  At its worst, after heavy

rain, the standing water measured up to thirty-six inches deep.

The standing water had not percolated into the sand after over

thirty-six hours, as the Army Corps had anticipated.  Testing

has confirmed that, at times, the standing water contains unsafe

levels of bacteria and contaminants.  Direct contact with such
water may cause illnesses or other ailments.  That these
conditions are unacceptable, to say the least, is clear.  No one
disputes that.  Indeed, the Army Corps conceded that it had not
anticipated such extensive ponding during construction and that
it is actively investigating its causes and possible solutions.
Why the Army Corps did not do more before is confounding.  The
Army Corps must, therefore, do more, as set forth below.[6]

There is no credible evidence, however, before this Court
that the extensive, long-lasting ponding that is occurring mid-
construction will persist after the Project's construction is
complete.  As Jonathan Schwaiger, the Army Corps' professional
civil engineer, testified, the construction of the dunes
involves dredging wet sand from the ocean floor.  This process
involves pumping approximately 9.6 million gallons of seawater

---

[6] The evidence before the Court is that there were no
modelling studies about the during-construction phase, but only
the post-construction phase.  It is difficult to conceive why
this was never done.  That the Project would impact not only the
City of Margate, but other communities, during construction is
undeniable.  Although the Army Corps did not anticipate such
problems, a pre-construction investigation would have been more
prudent.  In any event, that ship has sailed, and how to deal
with the unanticipated consequences is left to this Court's
balancing of the factors to achieve the common goal of public
health and safety.
Moreover, the parties quarrel over whether it was
"irresponsible" for the Army Corps not to have done a during-
construction impact study.  Such contentiousness seems
unproductive.  At this point, the Court's objective is not to
affix blame, but to fix the problem, as best it can.

onto the beach along with the wet ocean sand.  This saturates

the surrounding sand on the beach, impacting the ground water

table and resulting in temporary localized mounding.  It is

unclear at this juncture the extent to which the 9.6 million

gallons of ocean water and/or the extensive rainfall that has

occurred during the past two months have contributed to the

present ponding conditions.  Nevertheless, Mr. Schwaiger

stressed that such conditions are not permanent.  As the dredged

sand dries and equilibrates, the ground water table will return

to its pre-construction state.  Mr. Schwaiger testified that

this is consistent with his experience during the construction

of dunes in Sea Isle City, where ponding occurred during

construction, but dissipated after construction was complete and

the ground water table had equilibrated.[7]  The Hydrological

---

[7] While ponding has occurred to a greater extent in Margate
than in Sea Isle City, this is likely a result, at least in
part, of Margate's existing storm water drainage system.  The
parties seem to agree that Margate's storm water drainage system
is unique.  Although Margate contends that its drainage system
is within code, that is not the point.  The evidence seems to
call for the conclusion that if Margate's storm water drainage
system contained drainage pipes that extended to the ocean, like
other surrounding communities, the problems Margate is presently
experiencing would be lessened, if not altogether resolved.
Although Plaintiff claims that the Army Corps was attempting to
impose a one size fits all dune system in Margate, this is not
the case.  The design of the dune and berm system was
specifically modified by shifting the dune eastward to
accommodate the particular characteristics of Margate's beach
and storm water drainage system.

Investigation Report completed by the Army Corps likewise confirms that the Project, in its final, fully-constructed form, will not worsen ponding on the beach.[8]

Moreover, as the Army Corps thoroughly explained, as the construction continues and the basin between the bulkhead and the landward toe of the dunes is extended, ponding will be reduced as the water is able to spread across a larger area and percolate into the sand. Mr. Schwaiger explained this common sense concept using a helpful cup and Tupperware analogy. A given volume of water in a cup will be deeper than in a shallow but wider Tupperware container. Evidence of this phenomenon in action is already apparent. The Army Corps offered photographs of the basin between Huntington and Iroquois Streets in Margate on August 8, 2017 at 6:39 a.m. and August 9, 2017 at 6:48 a.m. [Army Corps Ex. 1]. On August 8, 2017, some minimal ponding is visible shortly after the rain stopped. The next day, however, all the standing water had dissipated into the sand. Mr. Watson testified that the standing water percolated into the sand during the twenty-four hour period, as predicted by the Army Corps' post-construction models, without any other mitigation measures having been implemented in this location to encourage percolation.

---

[8] It should go without saying that if the Army Corps is wrong, it will need to make it right.

Mr. Schwaiger further explained that the most effective efforts to mitigate the interim ponding will involve continued construction to expand the basin and facilitate percolation of the water into the sand. In Mr. Schwaiger's opinion, the Army Corps can "mitigate [the ponding conditions] by continuing to build, and we could give that water some area to move." He "is concerned that," with the temporary restraints in place, "we have created just one localized area by stopping [construction] for storing [water], so I think that it can be mitigated." Continued construction, along with other mitigation measures like pumping water out, is critical to avoid exacerbated and continued ponding conditions.

The parties argue over whether it is more irresponsible to delay completion of the dunes until after hurricane season or to persist with construction while expansive ponds cover much of the beach. The result of these diametrically opposed arguments has resulted in a standstill. The Court is certain, however, that <u>inaction is not an option</u>. At this juncture, the parties appear to recognize that the dunes are "a foregone conclusion," to use Margate's counsel's words. The question then becomes how to ensure that the dunes are constructed in such a way that protects public health and safety not only post-construction, but <u>during</u> construction as well.

The testimony before this Court made clear that, while there is no perfect solution to accommodate the interests of all parties, there are ample measures that both sides agree have been taken or can be taken to mitigate the public safety and health hazards created during the construction of the dunes. The Army Corps is actively engaged in ongoing data collection and studies regarding the ground water table and other variables to ascertain the root causes of the ponding and effective solutions. As Mr. Schwaiger testified, however, to effectively study the causes of the ponding, the Army Corps must be permitted to continue construction on the beach. Until the temporary restraints are lifted and construction can resume, the Army Corps "won't be able to answer any of [the public's] questions." Thus, this investigation is critical and must continue. The results of these investigations must be shared and may require ongoing modification of this Court's Order.

As to the parties' agreement on mitigation measures, elevated walkways across the standing water have been created and maintained. As the lifeguards testified, these walkways have already helped. And, as Gary Brown, Margate's environmental engineer agreed, these will continue to mitigate the risks associated with direct contact with the standing water and facilitate access to and enjoyment of Margate's beaches. Mr. Brown further testified that fences and signs would also

help eliminate the risks of contact with the ponded water.

Fences or some other physical barriers around the ponded areas

would also reduce the risks to children and others who may

attempt to enter or traverse the standing water. Moreover,

pumping the standing water out of the basin between the bulkhead

and dunes has already proved to be an effective mitigating

measure. For the reasons articulated by Mr. Brown, to be most

effective, such pumping should be done promptly and during the

course of construction, to the extent feasible, not merely

twenty-four to thirty-six hours after rainfall, so that the

water does not stand in the summer heat for extended periods of

time.[9] Ongoing pumping efforts will also ensure that ponding of

the alarming depths observed thus far does not recur. If sludge

layers develop after ponding, as Mr. Brown testified, such

layers can be cleaned up. Additionally, ponded water that has

been sitting for twenty-four hours or more must be tested for

bacteria, parasites, and other contaminants to ensure that the

beaches are safe for use. This is consistent with the

statements of the Atlantic County Health Department to one of

Margate's witnesses that bacteria begins to grow after water has

---

[9] The testimony before the Court was that Margate did not
permit pumping between the hours of 10:00 a.m. and 6:00 p.m.
This time restriction should not be imposed so that the standing
water can be removed as expeditiously as possible.

been ponded for twelve to twenty-four hours and Mr. Brown's
testimony that people should not come into direct contact with
storm water that has been standing for twelve to twenty-four
hours.[10]  If necessary, certain stretches of the beach may need
to be closed for limited periods of time to ensure public
safety.  Finally, and in addition to fencing around actively
ponded areas, each construction phase of roughly 100 linear feet
must be fenced off to protect the public.

Accordingly, having considered the harms claimed by
Margate, the Court finds that there are measures that can be
taken to prevent Margate from irreparable harm.  Margate's grave
concerns over public safety and health are understandable and
cry out for help.  The measures this Court will put in place,
although not perfect, should serve to prevent irreparable harm.

The Court must also "balance the competing claims of injury
and must consider the effect on each party of the granting or
withholding of the" temporary restraints.  <u>Winter v. Nat. Res.
Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008).  The Court "should
pay particular regard for the public consequences in employing
the extraordinary remedy of injunction."  <u>Id.</u>  Where the
government is the party opposing the injunctive relief, courts

---

[10] Indeed, as Mr. Brown testified, this applies equally to
the storm water that has historically collected on Margate's
beach after rain events before the construction of the dunes.

19

may consider the balancing of the harms and the public interest together.  See Nken v. Holder, 556 U.S. 418, 435 (2009).  The Court has balanced the equities and harms to the parties and considered the public interest.  For the reasons articulated above, the Court finds that the equities and public interest do not support the issuance of temporary restraints halting construction of the Project altogether.  The Army Corps and the public have a strong and important interest in constructing the Project efficiently and promptly so that the people of Absecon Island are adequately guarded from the devastation of storm events during the upcoming hurricane season.  Again, the Army Corps persists in its opinion that the dunes, once the entire Project has been completed, will not worsen ponding conditions and will protect the island coast, including Margate.  Margate and its residents have equally important interests in being protected from public safety and health hazards caused by standing water and ponding and in safely accessing the beach during the construction of the dune system.

While the parties present their interests as competing interests, the Court believes they are better viewed as common interests and goals of all parties.  All parties agree that protecting the entirety of Absecon Island from destruction and devastation by hurricanes and flooding is a critical and worthy endeavor.  Similarly, all parties agree that reducing public

safety and health hazards such as large ponded areas on a popular beach during the height of summer is also important and necessary. These goals need not be mutually exclusive. Thus, the Court will modify the temporary restraints and permit the Army Corps and Weeks to resume construction of the Project and will require their compliance with the conditions set forth in its accompanying Order. The Court is hopeful that the ongoing data collection and investigation by the Army Corps will yield effective solutions that will permit the Project to proceed in a manner reasonably amenable to all parties. The Army Corps is directed to continue its data collection and investigation and shall promptly report the results of such investigation to the Court, as set forth in its accompanying Order.

Accordingly, for the foregoing reasons, the Court grants, in part, the Army Corps' Motion for Emergent Dissolution of Temporary Restraints and modifies the Temporary Restraining Order as set forth above and in the accompanying Order. An appropriate Order shall issue on this date.

s/Renée Marie Bumb
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

Dated: August 10, 2017